T.C. Memo. 1998-136


UNITED STATES TAX COURT


MELVYN L. BELL, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DARLENE K. CARVIN, FORMERLY DARLENE C. BELL, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21039-93, 21040-93.      Filed April 6, 1998.


D. Derrell Davis, for petitioner in docket No. 21039-93.

Stephen P. Hale and James R. Hall, Jr., for petitioner in docket No. 21040-93.

Edsel Ford Holman, Jr., for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined deficiencies in petitioners' Federal income tax of $384,753 and $251,411, for taxable years 1985 and 1986, respectively, and a deficiency of $309,459 for taxable year 1988.

After concessions, the issues for our consideration are: (1) Whether petitioners are entitled to a business bad debt deduction in 1988 under section 166[1] and to the carryback of the resulting 1988 net operating loss to the 1985 and 1986 taxable years, and (2) whether petitioner Darlene K. Carvin is entitled to relief as an innocent spouse under section 6013(e).

## FINDINGS OF FACT[2]

At the time the petitions in these consolidated cases were filed, petitioner Melvyn L. Bell and petitioner Darlene K. Carvin, formerly Darlene C. Bell, resided in Little Rock, Arkansas. During the years in issue, petitioners were married and filed joint Federal income tax returns. Petitioners divorced in 1991.

Melvyn L. Bell (petitioner) received a bachelor's degree in electrical engineering in 1960. He had started working for an engineering firm in 1959 and later became a partner in the firm. Throughout his engineering career, petitioner was involved in a number of business ventures. In the latter part of 1959, petitioner had cofounded Data Testing, Inc., a company that tested soils, asphalts, and concrete. The company later merged with the engineering firm. A couple of years after he began

---

[1] Unless otherwise stated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The stipulation of facts and attached exhibits are incorporated herein by this reference.

working at the engineering firm, petitioner took a leave of absence to manage a blueprinting company, Southern Blueprint Co. He acquired that company while it was in bankruptcy by borrowing money to pay some of the company's creditors. Petitioner operated the company for less than a year and then sold the company for a profit.

Petitioner had also been involved in a number of other residential and commercial real estate development projects. One of the real estate ventures was Fairfield Communities, Inc., in which petitioner became involved in 1966. Petitioner provided engineering and planning services to the business, dividing his time equally between it and the engineering firm. Petitioner retained an interest in Fairfield Communities until at least 1985. On their 1985 tax return, petitioners reported gain from the sale of stock in Fairfield Communities as long-term capital gain. In 1968, petitioner sold his partnership interest in the engineering firm where he had worked since college. He founded his own engineering firm and held an interest in that second firm until 1973.

In the mid-1970's, petitioner lent about $200,000 to Nygem Corp., which had manufactured snowmobile gas gauges. Nygem was in bankruptcy at the time of the loan. After petitioner became involved in the company, it began to manufacture printed circuit boards and became a profitable business. Although petitioner did not own any capital in the company, he received $1 million and stock in a hazardous waste disposal company, discussed below, for

his interest.  Petitioner also lent money to another company that was near bankruptcy, Consumat Systems, Inc., a solid waste incineration business.  With petitioner's funding, Consumat Systems became profitable.

From 1973 until 1986, petitioner's primary business activity was serving as the chairman and chief executive officer of Environmental Systems Co., Inc. (ENSCO), a hazardous waste disposal company.  In 1972, petitioner had advanced a substantial amount of money to ENSCO to develop a hazardous waste incinerator.  Shortly after petitioner provided the financing, it became clear that ENSCO would be unable to repay him.  Petitioner decided to become more involved in the management and operation of the struggling company with the goal of making it profitable.  He also took shares in the company based on his previous advances.  In 1986, petitioner decided to decrease his involvement in the day-to-day operations of ENSCO and remain involved only in the company's long-term planning.  At that time, petitioner had been selling some of his ENSCO stock.  From 1985 through 1988, petitioner sold ENSCO stock for total sales proceeds of approximately $31 million and capital gain of approximately $30.9 million.  In September 1988, petitioner owned over 2.3 million shares of ENSCO stock with an estimated value of $38.4 million.

When petitioner began to withdraw from the management of ENSCO, he decided to become more active in other business ventures.  In particular, he intended to acquire financially

distressed companies and turn them into profitable businesses. Petitioner believed that he could make the companies successful because of his past business success. In August 1986, petitioner formed Bell Equities, Inc. (BEI), a holding company, for this purpose. From 1986 to 1988, petitioner was the sole shareholder. During this period, he made capital contributions to the company of over $424,963. Petitioner made all decisions regarding which businesses BEI would acquire. During 1986 through 1987, BEI acquired a number of subsidiaries that were insolvent or operating at a loss. Petitioner was unable to turn any of the subsidiaries into profitable businesses. BEI had also acquired one subsidiary, Kaufman Lumber Co., that was profitable at the time of acquisition. None of the subsidiaries were sold or even offered or advertised for sale.

BEI's subsidiaries engaged in a variety of business activities, including manufacturing, lumber, radio and television broadcasting, advertising, and theme parks. BEI acquired majority interests in the following entities:

| Subsidiary | Date of Acquisition | Percentage Ownership |
|---|---|---|
| Kaufman Lumber Co. | 12/86 | 50 |
| | 3/89 | 50 |
| Monarch Mill and Lumber Co. | 8/86 | 90 |
| | * | 10 |
| Reelcraft, Inc. | 12/86 | 80 |
| Ainsley Communications, Inc. | 4/87 | 100 |
| The Entertainment and Leisure Corp. | 12/86 | 90 |
| Shotts-Vines, Inc. | 6/87 | 80 |
| PPD&G, Inc. | 5/87 | 100 |

   * Date of acquisition is not available in record.

The Entertainment and Leisure Corp. (TELCOR), a 90-percent subsidiary of BEI, was also a holding company. TELCOR wholly

owned the following four entities, each of which operated a theme
park:

| Subsidiary | Date or Year of Acquisition | Percentage Ownership |
|---|---|---|
| Ozarks Entertainment, Inc. | 12/86 | 92.5 |
| | 1987 | 7.5 |
| Deer Forest, Inc. | 1/87 | 100 |
| The Nygem Co. | 1/87 | 100 |
| Rapids, Inc. | 2/88 | 100 |

Petitioner did not directly own stock in any of the subsidiaries.
Petitioner served as the Chairman of BEI's four-member board of
directors.  During 1986 to 1988, petitioner did not receive wages
from BEI, TELCOR, or any of their subsidiaries.  Nor did
petitioner receive dividends from BEI during these years.

BEI usually purchased the subsidiaries through debt
assumption.  The subsidiaries needed capital to cover their
operating expenses and to stay in business.  The majority, if not
all, of the subsidiaries' assets had been encumbered by third-
party lenders before BEI or TELCOR acquired the subsidiaries.
Because of their poor financial positions, the subsidiaries could
not obtain bank loans.  Petitioner used his own assets to obtain
financing for the subsidiaries.  He borrowed approximately $14
million from banks at about 10-percent interest and pledged his
ENSCO stock as collateral.  Petitioner transferred the borrowed
funds to BEI and TELCOR, which, in turn, transferred the money to
their respective subsidiaries.  BEI also lent money to other
businesses that petitioner owned that were not subsidiaries.  BEI
and TELCOR each recorded the advances as "Notes Receivable-Melvyn
Bell" on a general ledger account.  Petitioner decided the amount

to advance to BEI and TELCOR after consulting with officers of the companies about the subsidiaries' financial needs. At times, petitioner also sold ENSCO stock and transferred some of the sale proceeds to BEI to cover operating expenses of the subsidiaries. Petitioner also personally guaranteed loans from third-party lenders to BEI, TELCOR, and the subsidiaries.

Officers of BEI and its subsidiaries met with petitioner's lending banks to discuss his personal banking and credit positions to ensure that BEI and TELCOR would continue to receive financing through petitioner. Petitioner's personal banking relationships were also discussed at BEI's board of directors meetings.

Petitioner did not receive collateral for the advances that he made to BEI or TELCOR. Almost 1 year after petitioner provided the first advance, he received a series of notes, payable on demand, from BEI, TELCOR, and TELCOR's subsidiaries reflecting the prior advances. He did not receive any notes directly from any of BEI's other subsidiaries. On October 31, 1987, petitioner received a promissory note from BEI for approximately $6.4 million. Petitioner also received a note from TELCOR for $250,000 on October 31, 1987, and three notes directly from subsidiaries of TELCOR for a total of approximately $1.3 million; two notes were dated October 31, 1987, and one was dated February 20, 1987. The notes were for the amounts that petitioner had previously advanced to the companies. The notes

accrued interest of 10 percent but did not require regular interest or principal payments.

In January 1988, petitioner conveyed a line of credit to BEI in the amount of $15 million. BEI issued to petitioner, in exchange for the line of credit, a promissory note that provided for interest to accrue at 10 percent and for payment of the principal and interest on January 1, 1994. In October 1988, petitioner also conveyed a line of credit to TELCOR in the amount of $1.75 million that was evidenced in a note with the same terms as the BEI note. Regular payments of principal or interest were not required under the notes. Petitioner's prior advances to BEI and TELCOR were accumulated into the two line-of-credit notes, and BEI and TELCOR could draw against the line of credit for additional advances up to the maximum stated in the notes less the amount of the prior advances. The first set of notes that had been executed on behalf of BEI, TELCOR, and the TELCOR subsidiaries (described above) were treated by the companies and petitioner as consolidated into the two line-of-credit notes.

Both BEI and TELCOR had negative shareholder's equity accounts and deficits in their retained earnings accounts as follows for fiscal years ending October 31:

BEI

| Year | Retained Deficit | Shareholder's Equity |
|------|------------------|----------------------|
| 1987 | ($2,427,382) | ($2,002,419) |
| 1988 | (7,384,635) | (6,959,672) |
| 1989 | (10,775,987) | (9,671,195) |

TELCOR

| Year | Retained Deficit | Shareholder's Equity |
|------|------------------|----------------------|
| 1987 | ($598,622) | ($137,551) |
| 1988 | (1,644,738) | (1,183,667) |

Petitioner was aware that repayment of the advances depended on the subsidiaries' becoming profitable.  During 1986 through 1988, BEI made payments on petitioner's behalf; for example, BEI made loan payments on the loans that petitioner originated to provide funding to BEI and TELCOR.  However, BEI and TELCOR did not make regular repayments of the advances.  On their original and amended 1987 tax return, petitioners reported interest income from BEI in the amount of $338,264.

During 1986 through 1988, petitioner also held ownership interests in a number of other business enterprises, including, among others:  Muskogee Mall Ltd.; The Gary Cos.; Magnolia Capri Associates Ltd.; Mediaplex, Inc.; Soneric, Inc.; Darbe Development Co.; Pier West Partnership; Ice House Center; Univest, Inc.; Belvedere Enterprises, Inc.; Fountainhead Resort Hotel, Inc.; Shrimp, Oyster & Beer Haus, Inc.; Urban Enterprises, Inc.; BRC Oil & Gas; Red Apple Enterprises, Ltd.; East Main Ventures, Inc.; Creative Culinary Systems, Inc.; Original City Associates, Ltd.; and Architectural Antiques, Inc.  In general, these businesses were organized as partnerships or S corporations.

Petitioner also advanced money to his other businesses. Although petitioner's other business interests were separate from BEI, financing and operation of these businesses were discussed

at BEI's board of director meetings.  Petitioner also lent money to other individuals and entities at an interest rate generally of 10 percent.  For the most part, the loans originated from petitioner's acting as a seller-financier of property or advancing money to purchase a business or real property.  In addition, petitioner occasionally lent money to an employee or relative.

Prior to 1987, petitioner's net worth was in excess of $60 million.  In 1986, petitioner sold ENSCO stock for an average price of about $24 per share.  At times during 1986, the sale price received was over $33 per share.  The precipitous drop in the stock market on October 19, 1987, known as "Black Monday", and management problems at ENSCO caused the ENSCO stock value to decrease to as low as $6.00 per share.  The decreased value of the ENSCO stock affected petitioner's ability to obtain financing for BEI because he had used the stock as collateral.  As a result of the stock market crash and management problems, it was necessary for petitioner to become more involved with ENSCO, and he had less time to devote to BEI.  In 1988, petitioner was serving as the chairman of ENSCO's board of directors and received over $300,000 in wages.

From 1986 to 1988, none of the subsidiaries earned a profit, except for Kaufman Lumber, which was profitable when it was acquired.  In 1988, one of BEI's subsidiaries, PPD&G, filed a petition for voluntary reorganization under chapter 11 of the Federal bankruptcy laws.  At the time of the bankruptcy petition,

PPD&G had total assets on its books and records of approximately $1.8 million and total liabilities of approximately $3.3 million, including $1.3 million in notes payable to BEI. In 1988, two other BEI subsidiaries, Reelcraft and Ainsley Communications, ceased operations. At the time of cessation of business, Reelcraft's total assets and total liabilities were approximately $1 million and $1.7 million, respectively. The liabilities included approximately $1.4 million owed to BEI. Petitioner did not make any efforts to collect money from these companies for repayment of the advances.

For the 1988 taxable year, petitioners claimed a business bad debt deduction of $5,360,636, consisting of $1,156,684 in advances to TELCOR and $4,203,952 in advances to BEI. The claimed deduction was the excess of the respective total liabilities of BEI and TELCOR, including the advances from petitioner, over the total assets of the entities. Neither BEI nor TELCOR recognized cancellation of indebtedness income in the amount of the bad debt deduction or reduced the amount of liabilities owed to petitioner on their books and records.

The bad debt deduction resulted in a net operating loss (NOL) in 1988 of $3,057,871. On May 3, 1989, petitioners filed a Form 1045, Application for Tentative Refund, seeking refunds of $384,753 and $162,519 for Federal income tax paid in 1985 and 1986, respectively. The claimed refunds are based on the carryback of the 1988 NOL. In a statement attached to the refund application, petitioners requested expedited processing of the

refund application so that they could use the refunds to pay bank obligations that were 90 to 180 days overdue. The Internal Revenue Service made tentative refunds to petitioners in the amounts shown on the Form 1045. The checks were endorsed by both petitioners. Petitioner used the tax refunds to make payments on his overdue loans.

After claiming the bad debt deduction for 1988, petitioner continued to make advances to BEI and TELCOR. During calendar years 1989 and 1990, he advanced $2,665,795.75 and $868,270.41, respectively, to BEI, and during calendar years 1989 and 1990, he advanced a total $438,117.62 to TELCOR. In 1990, petitioner made a capital contribution of over $15 million to BEI that consisted of ENSCO stock.

In the notice of deficiency, respondent disallowed the business bad debt deduction for taxable year 1988. Disallowance of the 1988 deduction eliminated the NOL in 1988 and resulted in the disallowance of the carryback losses to petitioners' 1985 and 1986 taxable years, creating deficiencies for those years.

Petitioners' Federal income tax return for 1988 and the refund application for 1985 and 1986 were prepared by Donald V. Moore, Jr., a certified public accountant. Mr. Moore also prepared the corporate tax returns for BEI. The 1988 return and the refund application were signed by petitioners. Ms. Carvin did not look at the 1988 return before signing it and was not aware of the $5 million bad debt deduction claimed on the return. Neither petitioner nor Mr. Moore explained the bad debt deduction

to Ms. Carvin.  At the time Mr. Moore prepared petitioners' tax return, he believed that the bad debt deduction was valid. However, he did advise petitioner about certain tax risks associated with the deduction.

Ms. Carvin is a high school graduate and has no special training in business, accounting, or finance.  She met petitioner while working as a receptionist for Fairfield Communities in the early 1970's.  They married in 1974.  Sometimes Ms. Carvin worked outside the home in various jobs.  She was the president of Architectural Antiques, Inc., a company wholly owned by petitioners.  She did not run the day-to-day operations or make financial decisions for the company.  After the birth of petitioners' daughter in 1985, Ms. Carvin became even less involved in the antique business and rarely, if ever, went to its place of business.  Ms. Carvin attended antique shows and auctions with petitioner, but petitioner purchased most of the antiques.  Architectural Antiques ceased business in 1989, and the antique inventory was sold to pay petitioner's bank obligations.

Ms. Carvin was not involved in the operation or management of BEI, TELCOR, or their subsidiaries.  Petitioner did not discuss his business dealings with Ms. Carvin or answer questions that Ms. Carvin asked about the business.  Ms. Carvin was not aware of the amount of petitioner's advances to BEI and TELCOR or that the ENSCO stock was used as collateral to obtain loans for BEI and TELCOR.  Ms. Carvin did not know the number of businesses

owned by petitioner or the couple's net worth. She was aware of the financial difficulties in petitioner's business affairs, in particular the drop in value of the ENSCO stock, because the business problems decreased petitioners' standard of living and impacted petitioners' household budget, which Ms. Carvin managed. As part of the property settlement in petitioners' divorce, Ms. Carvin received BEI, whose only remaining subsidiary was Kaufman Lumber. Mr. Bell received TELCOR and its four subsidiaries.

OPINION

Petitioners seek to deduct advances to corporations from their reported ordinary income, claiming that the advances are partially worthless bad debts. Section 166 entitles a taxpayer to a deduction for a bad debt that becomes worthless during the taxable year. A business bad debt can be deducted from ordinary income if it is either partially or totally worthless. Sec. 166(a). A nonbusiness bad debt is deductible only as a short-term capital loss and only if the debt becomes totally worthless during the taxable year. Sec. 166(d)(1)(B). Only a bona fide debt is deductible. Sec. 1.166-1(c), Income Tax Regs. Petitioner bears the burden of proving that a bona fide business debt exists and that the debt became worthless during the taxable year in issue. Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981); Rude v. Commissioner, 48 T.C. 165, 172 (1967).

Petitioner contends that the advances to BEI and TELCOR constitute a bona fide business debt and that the debt became partially worthless in 1988. Respondent argues that the advances

were capital contributions, and, therefore, no genuine debt existed to which section 166 could apply. Alternatively, respondent contends that, assuming that the advances were valid loans, the loans were nonbusiness bad debt, and petitioners are not entitled to deduct partially worthless nonbusiness debt under section 166(d). As a second alternative argument, respondent maintains that the purported debt did not become partially worthless in 1988. Petitioner Darlene Carvin concedes that the bad debt deduction is not allowable and seeks relief under the innocent spouse provisions of section 6013(e).

Because petitioner claims partial worthlessness for the taxable period under consideration, the only relief available to him would be through a finding that the advances constituted business debt within the meaning of section 166(a). Accordingly, we focus on that aspect of the case. To qualify as a business bad debt, petitioner must show that he was engaged in a trade or business and that the bad debt was proximately related to that trade or business. Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income Tax Regs. Promoting, organizing, financing, and selling corporations may constitute a trade or business for purposes of section 166. Deely v. Commissioner, 73 T.C. 1081, 1093 (1980), supplemented by T.C. Memo. 1981-229; Newman v. Commissioner, T.C. Memo. 1989-63; Farrar v. Commissioner, T.C. Memo. 1988-385. On the other hand, the management of one's investment, regardless of how extensive, is not a trade or business, and a loan from a

shareholder to a corporation for the purpose of protecting or enhancing the shareholder's investment in the corporation is a nonbusiness debt. Deely v. Commissioner, supra at 1092. An intention to sell stock of a company for profit is consistent with the goals of an investor, and a taxpayer with such an intention is not in the trade or business of dealing in corporations unless his activities are so extensive and continuous as to constitute a separate trade or business. See Imel v. Commissioner, 61 T.C. 318, 323 (1973).

In Whipple v. Commissioner, 373 U.S. 193, 202 (1963), the Supreme Court stated:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer * * *

To be engaged in a trade or business of promoting business entities, a taxpayer must seek compensation "other than the normal investor's return" and must conduct the activity for a fee or commission or with the immediate purpose of selling of the companies at a profit in the ordinary course of that business. Deely v. Commissioner, supra at 1093. A taxpayer who seeks a return from long-term investments rather than a quick sale after the corporation becomes established is more likely to be viewed as an investor rather than a business promoter. Id. at 1093-

1095. When engaged in business promotion, the taxpayer receives income directly for the services provided to the corporation rather than indirectly through the corporation's success. Whipple v. Commissioner, supra at 203. Whether the taxpayer is engaged in a trade or business is a question of fact. United States v. Generes, 405 U.S. 93, 103 (1972).

Petitioner contends that he was in the trade or business of buying and rehabilitating financially troubled business entities and then selling them for profit and that he made the advances to BEI and TELCOR in the ordinary course of that trade or business. Petitioner testified that his intention was to sell the BEI subsidiaries once they became profitable. However, petitioner was contradicted by BEI's officers who testified at trial. Two officers identified resale of the subsidiaries as only one possible option and did not view the quick sale of the subsidiaries as BEI's purpose. The officers also considered it to be desirable for BEI to operate the subsidiaries after they became successful. The bylaws of BEI did not specify that the corporate purpose was to acquire struggling companies and rehabilitate them for a quick sale at a profit.

The BEI subsidiaries do not themselves provide tangible evidence that petitioner indirectly held the subsidiaries as his inventory rather than as investments. None of those unprofitable subsidiary companies improved, and there is no evidence that petitioner intended and/or attempted to sell them. BEI's actions with regard to Kaufman Lumber are inconsistent with the professed

purpose for BEI. Kaufman Lumber was profitable when BEI acquired a 50-percent interest in December 1986. Neither BEI nor petitioner made an effort to resell Kaufman Lumber at a profit. Instead, BEI acquired the remaining 50 percent of the company in 1989 and continued to hold it at the time of petitioners' divorce in 1991.

Petitioner argues that he has a history of rehabilitating and selling businesses for a period of nearly 30 years. There is some evidence in the record that petitioner had a reputation in his community as a business entrepreneur. Petitioner had interests in about 20 businesses in addition to the BEI subsidiaries. Petitioner contends that he also held these entities as part of his business of promoting and developing businesses. However, there is no credible evidence that the other business enterprises were held as inventory for resale. We cannot determine from the record the length of time that petitioner held the businesses, and it appears that petitioner held them for considerable periods of time without any intention of selling them. Only a few of these businesses were marginally profitable, and petitioner did not take any affirmative steps to advertise or sell them. Evidence offered by petitioner at trial shows that he successfully turned around and sold only three companies (Southern Blueprint, Nygem, Consumat) over a period of 30 years. Petitioner's accountant was not aware of a single instance where petitioner successfully rehabilitated a struggling company apart from ENSCO. Petitioner's prior business activity

does not establish an extensive or continuous activity of promoting corporations for sale as to constitute a separate trade or business.

Petitioner has not established that he provided promotional services to the companies he owned. Except for the blueprinting company in the early 1960's, there is no evidence that petitioner provided anything but financing to the companies. Petitioner did not actively seek out companies to promote and did not advertise the companies he had. On tax returns for 1985 through 1988, petitioner reported income and loss from business enterprises separate from BEI as passive income and loss. Petitioner's primary activity with regard to BEI was to attend board of directors' meetings where he discussed financing for the BEI subsidiaries and acquiring additional businesses. These activities do not differ from those an investor would take to protect and expand his investments. Petitioner has not identified promotional services that he provided to the BEI subsidiaries for which he would have been compensated upon the resale of one of the BEI subsidiaries.

The record in this case does not reflect the amount of time that petitioner spent involved in managing or operating the BEI subsidiaries. We note that petitioner indicated that he devoted a significant amount of time to ENSCO during 1986 to 1988 and received a salary exceeding $300,000. Petitioner attributed his inability to successfully rehabilitate the BEI subsidiaries to the time demands of ENSCO. There was no showing by petitioner

whether the gain from sale of three companies over the years was reported as capital gain or as ordinary income.

On their 1988 financial statement, petitioners listed their interest in BEI as an investment and not as inventory. In addition, on BEI's tax return it was reported that the corporation was engaged in the management of investments. Petitioner did not hold himself out and/or view himself as a dealer in corporations.[3]

Accordingly, petitioner was not in the business or lending money or buying and selling corporations. Ultimately, we must conclude that if the advances constitute debt, rather than equity, that it was non-business debt and would not qualify for a deduction under section 166(d) because it was not wholly worthless at the end of 1988, a fact that petitioner does not dispute. Due to our holding, it is unnecessary to consider whether the advances constituted debt or equity.

---

[3] There was discussion in the briefs of the parties, primarily respondent and Ms. Carvin, as to whether petitioner was engaged in the business of lending money. At trial, petitioner maintained that in addition to the purported loans he provided to BEI, he also lent money to his other businesses and to unrelated individuals and entities. In his reply brief, petitioner stated, "Petitioner's business, as regarding the deductions at issue, was the business of buying, rehabilitating and selling companies, not the business of lending money." Petitioner only half-heartedly argued that he was in the trade or business of lending money. Petitioner did not make the advances to BEI in the course of a money lending business, and he was not in the business of lending money.

Innocent Spouse Relief

When a husband and wife file a joint Federal income tax return, liability for the tax due is joint and several on their aggregate income; thus, either spouse may be required to pay the entire amount. Sec. 6013(d)(3); Pesch v. Commissioner, 78 T.C. 100, 129 (1982). Under section 6013(e), however, one spouse may be relieved of the liability as an innocent spouse. To be entitled to innocent spouse relief, the spouse seeking relief must satisfy each of the following requirements: (1) A joint return was filed; (2) there is a substantial understatement of tax on the return; (3) the understatement is attributable to a grossly erroneous item of the other spouse; (4) the spouse seeking relief did not know, or have reason to know, of the substantial understatement when signing the return; and (5) upon consideration of all the facts and circumstances, it would be inequitable to hold the spouse seeking relief liable for the income tax deficiency attributable to the understatement. Sec. 6013(e)(1); Purcell v. Commissioner, 86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). The requirements of section 6013(e)(1) are conjunctive, rather than alternative, and all of the statutory requirements must be met for the taxpayer to be afforded relief. Estate of Jackson v. Commissioner, 72 T.C. 356, 360 (1979). Ms. Carvin has the burden to prove that she is entitled to relief as an innocent spouse under section 6013(e). Rule 142(a); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

The parties have stipulated that petitioners filed joint returns for the years at issue, and respondent and Ms. Carvin agree that the bad debt deduction is attributable to petitioner Mr. Bell and that the understatement was substantial. The remaining issues are: (1) Whether the bad debt deduction is grossly erroneous; (2) whether petitioner Darlene Carvin knew, or had reason to know, of the substantial understatement of tax when she signed the return; and (3) whether it would be inequitable to hold Ms. Carvin liable for the income tax deficiency. If we determine that one of the requirements for innocent spouse relief has not been met, the other factors do not need to be considered. Bokum v. Commissioner, 992 F.2d at 1134.

For purposes of section 6013(e), a deduction is "grossly erroneous" if there is no basis in fact or law for the deduction. Sec. 6013(e)(2)(B). A deduction has no basis in fact when the expense for which it is claimed was never, in fact, made. Douglas v. Commissioner, 86 T.C. 758, 762 (1986). A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made in support of its deductibility. Id. A deduction that is without basis in fact or law is one that is frivolous, fraudulent, or phony. Id. at 763. The fact that a deduction has been disallowed does not, per se, prove that the deduction is grossly erroneous. Ness v. Commissioner, 954 F.2d 1495, 1498 (9th Cir. 1992), revg. 94 T.C. 784 (1990); Russo v. Commissioner, 98 T.C.

28, 32 (1992). We evaluate whether a claimed deduction is grossly erroneous as of the time of filing of the tax return. Bokum v. Commissioner, 992 F.2d at 1142.

Ms. Carvin argues that the bad debt deduction was grossly erroneous because the debt was not a business debt that arose out of a trade or business of petitioner's. In particular, Ms. Carvin argues that neither petitioner nor BEI was engaged in the trade or business of buying and selling companies. Alternatively, Ms. Carvin maintains that if such a business existed, it was the trade or business of BEI, and the activities of BEI cannot be attributed to petitioner as the sole shareholder. Ms. Carvin does not argue that petitioner's positions that the advances were bona fide debt or that the advances became partially worthless in 1988 were grossly erroneous. Respondent argues that although petitioner's argument that he was engaged in the business of rehabilitating distressed companies for resale is incorrect, that argument is reasonable, and therefore the section 166 deduction was not grossly erroneous.

Petitioner maintains that he organized BEI as a conduit through which he could purchase, promote, finance, manage, and sell corporations. Petitioner has been involved in numerous business enterprises since 1960. In taxable year 1988, he had direct or indirect interests in over 35 businesses. Petitioner testified that he formed BEI with the intention of acquiring financially troubled companies, turning them into profitable

businesses, and reselling the businesses for a quick profit. Although petitioner's experience with turning around troubled companies is not so extensive and continuous as to establish that he was engaged in a trade or business, he does have some history of rehabilitating financially troubled businesses beginning in 1960.

Accordingly, we find that there is a reasonable basis for petitioner to have claimed that he acquired his interests in the BEI subsidiaries as inventory and not merely as investments.

Ms. Carvin argues that even if a trade or business of buying and selling business enterprises did exist, the activity is that of BEI and not petitioner individually. The bad debt deduction was based on advances made to BEI, a corporation that petitioner wholly owned, and TELCOR, a 90-percent subsidiary of BEI. In general, a taxpayer cannot treat the business activity of a wholly owned corporation as his own trade or business for purposes of section 166. Vreeland v. Commissioner, 31 T.C. 78 (1958). A shareholder is not engaged in the trade or business in which the corporation is engaged unless the shareholder engages in such trade or business apart from affiliation with the corporation. See Smith v Commissioner, T.C. Memo. 1994-640.

Petitioner organized BEI to conduct his business ventures in corporate form. Petitioner was the sole shareholder of BEI and the chairman of BEI's four-member board of directors. For the advances to be deductible by petitioners as business bad debt, we would need to ignore BEI's corporate form and attribute the

activities of BEI to petitioner.  We have looked through the corporate form of a holding company and attributed the business activity of promoting to the shareholder.  Whether we ignore the holding company would depend on the shareholder's personal involvement in the corporation and the shareholder's business activity separate from the corporation.  See Farrar v. Commissioner, T.C. Memo. 1988-385.  Petitioner made all significant decisions regarding the amount of financing the company would receive and which business enterprises to acquire. Also, there is some evidence of petitioner's independent involvement in rehabilitating financially troubled businesses. Accordingly, the fact that petitioner did not directly own the BEI and TELCOR subsidiaries or directly hold them for sale does not render petitioner's argument that the advances were business debt groundless.

While petitioner's involvement with the various businesses was insufficient to establish that he was in the business of promoting and selling businesses, there was some basis for believing that the advances were made for business purposes and not for investment purposes.  We find that the characterization of the advances as a business debt is not frivolous, fraudulent, or phony and that the bad debt deduction has some basis in fact or law within the meaning of section 6013(e)(2)(B).  Accordingly, we find that the bad debt deduction was not grossly erroneous. We need not address the other conjunctive requirements of section 6013(e)(1) that are in issue in this case.  Petitioner Darlene

Carvin remains jointly and severally liable for the income tax deficiency for taxable years 1985, 1986, and 1988 as determined above.  Sec. 6013(d)(3).

<u>Decisions will be entered under Rule 155.</u>