THOMAS A. ROSSE & another[1] vs. COMMISSIONER OF REVENUE.

Suffolk. October 6, 1999. - December 13, 1999.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Taxation,* Income tax, Abatement, Gross income, Deduction from income. *Statute,* Construction. *Words,* "Active conduct of trade or business."

In a tax abatement proceeding, the findings of fact of the Appellate Tax Board were supported by the evidence. [434-435]

The conclusions of the Appellate Tax Board, that a taxpayer's activities did not amount to the "active conduct of a trade or business" [435-436] and that certain dividend income against which the taxpayer sought to claim business expense deductions was not "effectively connected" with the conduct of a trade or business [436-439], were supported by the evidence, with the result that the board correctly denied the taxpayer's application for abatement [439].

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William E. Halmkin (David B. Mack* with him) for the taxpayers.

*Pierce O. Cray,* Assistant Attorney General (*Anne T. Foley* with him) for Commissioner of Revenue.

ABRAMS, J. Pursuant to G. L. c. 58A, § 13, the taxpayers appeal from a decision of the Appellate Tax Board (board). The board affirmed the Commissioner of Revenue's (commissioner's) denial of the taxpayers' applications for abatement of their 1989 and 1990 personal income taxes. The taxpayers, Thomas and Florence Rosse, sought to apply excess deductions against dividend income under G. L. c. 62, § 2 (*c*). The board determined that an abatement should not be granted because the dividend income was not earned in the active conduct of a trade or business and because the dividend income was not "effectively connected with the active conduct of a trade or busi-

---

[1]Florence M. Rosse.

ness of the taxpayer." G. L. c. 62, § 2 (*c*). We affirm the decision of the board.

1. *Facts*. a. *Rosse Enterprises, Ltd.* In 1983, Allied-Signal, Inc. (Allied), acquired Instrumentation Laboratory, Inc., a medical and scientific instrumentation company founded by Thomas Rosse (Rosse). In connection with the acquisition, Rosse exchanged his shares in Instrumentation Laboratory for approximately one million Allied shares at a basis of less than one cent per share. Because the Allied shares were worth significantly more than one cent, Rosse would have realized large capital gains if he sold any of the stock and would have incurred significant taxes on those gains. Therefore, as of 1989 and 1990, Rosse retained almost all of the Allied shares. In 1989 and 1990, Rosse's only connection with Allied was his ownership of the Allied shares and his receipt of dividend payments from Allied.

In 1983, the year that Allied acquired Instrumentation Laboratory, Rosse established a sole proprietorship, Rosse Enterprises Limited (REL). REL provided financing and consulting services for startup companies, slow-growth companies, and other ventures that appeared to have long-term potential for growth. Rosse hoped to earn money through REL in three ways: (1) through interest income from companies to which he loaned money; (2) through increases in the value of his equity position in companies to which he advanced money; and (3) through fees for management consulting services provided by REL.

Much or all of the working capital for REL came from a brokerage account at Kidder, Peabody (Kidder account) that existed long before Rosse founded REL. In each of the tax years at issue, the taxpayers received approximately $2.3 million in Allied dividends. The dividends were wired directly into the Kidder account. Other income also flowed into this account, including capital gains from the sale of various stocks and from the sale of Rosse's yacht. Rosse drew on the account both to capitalize REL and to pay personal expenses.

Rosse also funded REL by pledging some of the Allied shares as surety for various bank loans. Rosse retained unrestricted use of the dividends from the pledged shares.

Occasionally, Rosse needed additional capital to fund REL. In these instances, Kidder, Peabody advanced money at a margin against the contents of the Kidder account, which included the Allied shares and their dividends, as well as other dividends.

b. *The applications for abatement.* For tax purposes, Massachusetts divides "Massachusetts gross income" into two classes. G. L. c. 62, § 2. Part A gross income consists of dividends, interest and net capital gains (with various exceptions). § 2 (*b*) (1). Part B gross income consists of "the remainder of the Massachusetts gross income." § 2 (*b*) (2).

In 1989 and 1990, the tax rates for Part A income and Part B income varied significantly.[2] Part A income was taxed at a rate of 10% in 1989 and a rate of 12% in 1990. G. L. c. 62, § 4, as amended through St. 1975, c. 684, § 41; G. L. c. 62, § 4, as amended through St. 1990, c. 121, §§ 24-26. Part B income was taxed at a rate of 5% in 1989 and a rate of 5.2% in 1990. *Id.* The more than $2 million of Allied dividends were Part A income, taxed at the higher rate. The taxpayers sought to reduce the taxes on their Part A income.

The taxpayers sought an abatement under G. L. c. 62, § 2 (*c*). Generally, under G. L. c. 62, a taxpayer may apply business and various other expenses as deductions against Part B income. G. L. c. 62, § 2 (*d*). If the amount of the deductions exceeds the amount of Part B income, then the excess deductions may be applied against Part A income, but only to the extent that the Part A income is "effectively connected" with a "trade or business" of the taxpayer. G. L. c. 62, § 2 (*c*).

According to the taxpayers, the dividends from the Allied shares which were pledged for loans in connection with REL were "effectively connected" with the "active trade or business" of REL. The commissioner disagreed and denied both abatement applications. The taxpayers appealed to the board, which upheld the commissioner's denial of the abatements.

2. *The board's findings of fact.* General Laws c. 58A, § 13, limits the scope of our review of the board's findings of fact: "The decision of the board shall be final as to findings of fact." However, "the court may consider whether the evidence in the case is sufficient to support the board's conclusion of law." *Kennametal, Inc.* v. *Commissioner of Revenue*, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998), citing *Assessors of Weymouth* v. *Curtis*, 375 Mass. 493, 499 (1978); *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). Our review of the sufficiency of evidence is "limited to 'whether a

---

[2]On January 1, 2000, the differential between the tax rates on Part A and Part B dividend income will be eliminated. G. L. c. 62, § 4, as amended by St. 1998, c. 396, §§ 1-3.

contrary conclusion is not merely a possible but a necessary inference from the findings.' " *Kennametal, Inc.* v. *Commissioner of Revenue, supra,* quoting *Commissioner of Revenue* v. *Houghton Mifflin Co.,* 423 Mass. 42, 43 (1996).

The taxpayers make two claims as to the board's findings of fact. The first claim involves the board's finding that the taxpayers' evidence as to the number of Allied shares pledged against loans to REL was unsupported by the record. The board found that the taxpayers had presented evidence that approximately one-half of the Allied shares were committed as pledges against loans to REL during the 1989 and 1990 tax years. The taxpayers argue that the board's finding is contrary to the evidence presented. We disagree.

After reviewing the documentation provided by the taxpayers, we conclude that the board's findings of fact are sufficiently supported by the evidence.[3] The board's decision carefully sorts through copious loan documents to determine which pledges were substantiated in writing. The board properly exercised its discretion in not crediting the testimony of REL's accountant that more shares had been pledged than were explicitly evidenced in writing.

The taxpayers also claim that the board's findings as to the extent of Rosse's involvement with the companies in which he invested were contrary to the evidence presented. We disagree.

The board found that Rosse was, at times, actively engaged in providing advice and assistance to a few of the companies with which REL had a relationship. However, the board properly exercised its discretion in not crediting oral testimony that this involvement continued throughout 1989 and 1990. Nothing in

---

[3]The taxpayers refer us to four pieces of documentary evidence proffered to the board to demonstrate the extent of the pledged shares. Having reviewed this material, we observe that the financing statements pertaining to BayBank Middlesex involve a loan between BayBank and Homestead Industries, Inc. The only significant mention of Rosse in these statements is an agreement subordinating $12,500 of debt owed to Rosse by Homestead Industries. After the bank increased the amount of its commitment, Rosse also wrote a letter assuring BayBank that he would do everything in his power to ensure that the loan was paid. Neither of these facts provides compelling evidence that Rosse's shares of Allied were pledged against these loans.

We also observe that the pledge agreements to which the taxpayers refer us do not specify the loan or loans with which the pledges are associated. Further, there is no indication that these pledges were still in force during the tax years at issue here.

the record contradicts the board's finding that Rosse's involvement was not regular and continuous throughout the tax years in question.

3. *"Active conduct of a trade or business."* The taxpayers assert that Rosse's activities, conducted under the auspices of REL, amounted to the active conduct of a venture capital business. The board found that the taxpayers failed to establish that Rosse's involvement with the companies in which he invested was continuous and regular throughout 1989 and 1990. Given this finding, which accords with the record, the board's conclusion that Rosse's activities did not rise to the level of "active conduct" was correct.

We also note that REL was not a "venture capital firm" or "business promoter" as those terms generally are understood. General Laws c. 62, § 1, provides that "[w]hen used in this chapter . . . 'Trade or business' shall have the same meaning as in section sixty-two of the [Internal Revenue] Code." A number of decisions under the Code clarify when investments and other activities constitute a "trade or business."

"Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged." *Whipple* v. *Commissioner of Internal Revenue*, 373 U.S. 193, 202 (1963). In the context of deductions for bad debts connected with a trade or business of a taxpayer, the Tax Court has noted that "the management of one's investment, regardless of how extensive, is not a trade or business, and a loan from a shareholder to a corporation for the purpose of protecting or enhancing the shareholder's investment in the corporation is a nonbusiness debt." *Bell* v. *Commissioner of Internal Revenue*, T.C. Memo. 1998-136 (1998).

On the other hand, the "business of promoting business entities" has been recognized under the Code. *Id.* "To be engaged in a trade or business of promoting business entities, a taxpayer must seek compensation 'other than the normal investor's return' and must conduct the activity for a fee or commission or with the immediate purpose of selling of[f] the companies at a profit in the ordinary course of that business." *Id.*, citing *Deely* v. *Commissioner of Internal Revenue*, 73 T.C. 1081, 1093 (1980), corrected by T.C. Memo. 1981-229. In order to distinguish between hands-on investors and those engaged in promoting businesses, the Tax Court noted that "[a] taxpayer who seeks a return from long-term investments rather than a

quick sale after the corporation becomes established is more likely to be viewed as an investor rather than a business promoter." *Id.*

We conclude that the board's determination that Rosse's activities did not rise to the level of conducting a "trade or business" was supported by the record. Nothing in the record indicates that Rosse intended quick sales of the entities in which he invested. In fact, the taxpayers assert that Rosse expected to make money by waiting for the value of his investments to appreciate as the companies grew over the long term. In addition, Rosse's consulting and lending activities were not ongoing, regular, or continuous throughout 1989 and 1990. Absent any factual findings that Rosse was engaged in a regular course of promoting corporations for a fee or commission, the board's determination that REL was not a venture capital firm in 1989 and 1990 was correct. See *Gubbini* v. *Commissioner of Internal Revenue*, T.C. Memo. 1996-221 ("Whether petitioner is engaged in the trade or business of promoting corporations is a question of fact"). Therefore, the board's conclusion that Rosse's activities in connection with REL did not amount to the "active conduct of a trade or business" was supported by the record.

4. *"Effectively connected."* Also at issue is whether dividend income used to fund an enterprise of a taxpayer is "effectively connected" with that enterprise under G. L. c. 62, § 2 (*c*).[4] We agree with the board that it is not.

"The general rule of construction is that where the language of the statute is plain, it must be interpreted in accordance with the usual and natural meaning of the words." *Commissioner of Revenue* v. *AMIWoodbroke, Inc.*, 418 Mass. 92, 94 (1994). However, "in interpreting a general but undefined term used in a taxing statute, we have sanctioned an evaluation of the legislative history so as to reach a result consistent with the statute's purpose." *Id.* at 96, quoting *McCarthy* v. *Commissioner of Revenue*, 391 Mass. 630, 633 (1984). The phrase "effectively connected" does not convey the precise dimensions of the requisite quantum of connection, as this dispute makes clear.

---

[4]General Laws c. 62, § 2 (*c*), in pertinent part, reads: "Part A adjusted gross income shall be the Part A gross income less the following deductions and including the following class of gain income: (1) Any excess of the deductions allowable under paragraph (*d*) below over the Part B gross income; but the amount deductible under this paragraph *shall not exceed the amount of Part A gross income which is effectively connected with the active conduct of a trade or business of the taxpayer*" (emphasis added).

The taxpayers argue that the dividend income from the Allied shares was effectively connected to REL's ventures because (1) the dividend stream went to finance REL and (2) some of the shares were pledged against loans made to REL. As to both of these claims, the board ruled "that effective connection between income and business requires that the income have been produced or generated by, or attributable to, the business."

The phrase "effectively connected" certainly conveys something more than *any* connection. The question is: what degree of connection does § 2 (*c*) require between a taxpayer's business and his or her part A income? Based on the legislative history of the statute and on the purpose of the statute, we conclude that the board's interpretation of § 2 (*c*) was proper. We think that the Legislature intended the § 2 (*c*) deduction to serve as an offset of business expenses against business income, resulting in the taxation of net income.

The language at issue was added to Massachusetts tax law in 1973 as part of revisions addressing problems discovered after the enactment of 1971 revisions.[5] St. 1973, c. 273, § 2. See also McGee, Massachusetts Income Tax, 1973 Revisions, 17 B.B.J. 5, 7 (Dec. 1973). We confronted one of the ambiguities in the 1971 version of G. L. c. 62 in *Barnes* v. *State Tax Comm'n*, 363 Mass. 589 (1973). The 1971 law did not explicitly divide income into Part A and Part B income, but it accomplished the same purpose as later statutes by taxing much of what is now included in Part A income at a higher rate. G. L. c. 62, § 4 (*a*) (i), as amended through St. 1971, c. 555, § 5. In *Barnes*, a lender filed for declaratory relief, arguing that it should be able to deduct business expenses from interest income on its loans. The State Tax Commission disagreed.

We determined that "income subject to taxation" is essentially "gross income less all costs and expenses *incurred in producing that income*" (emphasis added). *Barnes* v. *State Tax Comm'n, supra* at 591. We therefore held that the taxpayer could deduct business expenses incurred in earning income from what would now be considered Part A income. *Id.* at 593. Our conclusion construed G. L. c. 62 as consistent with the long-standing understanding in this Commonwealth that, in the context of income taxation, income means "net income." *Id.* at 591, citing *Opinion of the Justices*, 5 Met. 596 (1844).

---

[5]In 1971, the Legislature amended the personal income tax law with an emergency measure intended to "provide needed revenue for the commonwealth and its cities and towns." St. 1971, c. 555.

The 1973 changes to the tax laws appear to have codified our conclusion in *Barnes* by replacing the 1971 version of the statute with the addition of the language in § 2 (*c*) at issue in this case. St. 1973, c. 723, § 2. See McGee, *supra* at 10 (noting that St. 1973, c. 723, provided for the deduction that we allowed in *Barnes*). The new statutory language allowed the same sort of deduction as that claimed by the taxpayer in *Barnes*, with the proviso that the deduction be limited to the amount of the Part A income that is "effectively connected with the active conduct of a trade or business."

The proviso apparently represents an attempt to address the problem raised in *Barnes* without allowing the taxpayer to claim deductions from income unrelated to trade or business. Deductions of business expenses against business profits are allowed, as is the usual case, in order to achieve the taxation of net income. However, the deductions against Part A income are limited to the portion of that income that would be considered income of the business or businesses for which the deductions are sought. This accords with the board's conclusion that § 2 (*c*) allows the taxpayer to reduce gross income by the cost of producing that income, even if part of the gross income is Part A income.

In this context, we note that *Barnes* involved precisely the situation in which a § 2 (*c*) deduction would be appropriate. In *Barnes*, the taxpayer earned money by making loans and collecting interest on those loans. The taxpayer also incurred expenses running its loan business. Under § 2 (*c*), the taxpayer in *Barnes* would have been able to apply excess Part B business expense deductions to the portion of Part A income that represented the interest collected on the loans. Thus, the § 2 (*c*) deduction applies only where a business of the taxpayer earns some Part A income.

This conclusion also accords with a technical explanation of § 2 (*c*) that the board considered.[6] The technical explanation was submitted by the Boston Bar Association State tax commit-

---

[6]The board relied, in part, on the reasoning in *Kargman* v. *Commissioner of Revenue*, 389 Mass. 784 (1983), in reaching its decision. The citation to the technical notes in *Kargman* suggests that the technical notes were a part of 1973 Senate Doc. No. 1315 and that they are part of the official legislative history of the statute. The taxpayers correctly point out that they are not. However, we may turn to unofficial sources in order to gain a "contemporary understanding of the underlying purposes" of the legislation. *Kartell* v. *Blue Shield of Mass., Inc.*, 384 Mass 409, 421 (1981).

tee, which had assisted in drafting the precursor legislation to the 1973 act. See Letter to the committee on taxation from the State tax committee of the Boston Bar Association, March 12, 1973, in McGee, *supra* at 16 (providing the history behind 1973 Senate Doc. No. 1315, enacted as St. 1973, c. 723).[7]

5. *Conclusion.* The board's interpretation of § 2 (*c*), which effectively taxes net income, is consistent with the legislative history of the statute. The board's determination that Rosse's activities did not constitute the active conduct of a trade or business and that the passive dividends earned by the Allied shares were not "effectively connected" with Rosse's activities accords with the statute and is supported by the evidence.

*Decision of the Appellate Tax
Board affirmed.*

---

[7]The technical notes state that: "Most Part A gross income is passive in nature, and no significant expenses are required in order to earn it. As to such income, no deduction is allowed for expenses, since even if expenses are incurred they are not 'necessary' to produce it nor do they inhere in the very nature of the income. In other cases, however, it is an active business which produces the income, and there may be expenses which are inherent and necessary. . . ." To assure that deductions are not allowed for passive income, the allowance under Part A is limited to the amount of Part A income derived from an active business. McGee, Massachusetts Income Tax, 1973 Revisions, 17 B.B.J. 5, 20-21 (Dec. 1973).